**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

**CESIUMASTRO INC.,**
*Plaintiff*

v.                                                                    **Case No.**  1:24-cv-314

**ERIK LUTHER and
ANYSIGNAL, INC.,**
*Defendants*

<u>**PLAINTIFF'S COMPLAINT AND JURY DEMAND**</u>

Plaintiff CesiumAstro, Inc. ("CesiumAstro") files this Complaint against Defendants Erik Luther ("Luther") and AnySignal, Inc. ("AnySignal") in the above-entitled action and states as follows:

**I.**

<u>**INTRODUCTION**</u>

1.      CesiumAstro builds systems and components for its aerospace customers, and it trusted Luther, its former Vice President of Product, with some of its most important trade secrets. That trust was misplaced.   While he was working at CesiumAstro, Luther misappropriated CesiumAstro's trade secrets and plotted to evade his contractual obligations not to compete against CesiumAstro.   And during his departure and since then, Luther has tried to hide his wrongdoing by spoliating documents and refusing to come clean about or stop his misconduct.   CesiumAstro had no choice but to file this complaint and seek court relief.

2.      CesiumAstro is an industry leader in specialized integrated hardware and software communications solutions for the aerospace industry.   As CesiumAstro's Vice President of Product—a senior sales and strategy position—Luther obtained key confidential information integral to CesiumAstro's business.   He had access to specifications, schematics, processes, software, firmware code, and diagrams mapping out the company's industry-leading,

groundbreaking aerospace communications solutions. He received CesiumAstro's confidential customer lists and contact information, pricing information, and bid practices, competitive assessments, strategy, customer channels, and advance development plans. And he was exposed to information, including the identities, contact details, and practices, of CesiumAstro's investors and potential investors.

3. Through a limited pre-suit investigation that Luther has obstructed, CesiumAstro has uncovered evidence that Luther exfiltrated some of this information to his personal devices and accounts, including his personal email accounts and personal thumb drives. Forensic evidence revealed, for example, that in the week leading to his resignation, Luther accessed an uncharacteristically large number of confidential CesiumAstro documents. And after he resigned, he refused—for months—to return CesiumAstro's property, attempting to extract a concession for doing so in the form of a release of all claims against him—notwithstanding that his employment agreement with CesiumAstro required him to return this material anyway. When Luther turned in his company-issued iPad, he had wiped it entirely, resetting it to factory settings and thereby forever destroying the evidence of his misconduct on that device. And then there are other pieces of hardware—including numerous USB devices that are known to have been plugged into Luther's company laptop—that have vanished.

4. Luther's misconduct has been done in concert with his co-defendant, AnySignal, a startup competitor to CesiumAstro. With only a few employees and $5 million dollars in investor funding, it would not even be in the same orbit as CesiumAstro, which has spent tens of millions of dollars working with (now) 170 employees for seven years to develop its technologies. But with Luther's help, AnySignal has launched to directly compete with CesiumAstro in the specialized space for software-defined radios ("SDRs"). Indeed, on his way out the door at

CesiumAstro, Luther claimed he was going to work for a "three-person company" to continue work aligned with his interests—a description that AnySignal fits. And on Luther's last day at CesiumAstro, he proclaimed his intention to develop his "ideas around SDRs" to compete against his former employer (despite contractual obligations forbidding it).

5.      Despite Luther's best efforts to erase any evidence of wrongdoing and months-long attempts to impede CesiumAstro's investigations, CesiumAstro has nevertheless experienced and uncovered the negative effects of Luther's and AnySignal's actions. These acts of misappropriation include soliciting a little-known potential investor in CesiumAstro (whose contact information Luther sent to his personal email address). They include developing a complicated radio technology offering that, on information and belief, could not have been developed on AnySignal's timeline and with AnySignal's scarce resources—absent CesiumAstro's technical diagrams and specifications (to which Luther had access). And they include AnySignal edging out CesiumAstro on this complicated radio technology in a sales bid to a customer (with whom Luther led a strategic engagement, and whose contact information he accessed, during his time at CesiumAstro).

6.      To remedy the wrongs committed by Luther and AnySignal, and to prevent any future ones, CesiumAstro brings this action for misappropriation of trade secrets under federal and Texas law, breach of contract, tortious interference with contract, and breach of fiduciary duty.

## II.
## PARTIES

7.      Plaintiff CesiumAstro is a Delaware corporation with its principal place of business in Austin, Texas.

8.      Defendant Luther is an individual who is a citizen of the State of Texas, residing at 3902 Valley View, Round Rock, Texas 78681.

9.      Defendant AnySignal is a Delaware corporation with its principal place of business located at 111 Eucalyptus Drive, El Segundo, California 90245.

### III.
### <u>VENUE AND JURISDICTION</u>

10.     The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 for CesiumAstro's claim under 18 U.S.C. §§ 1836–39, *et seq*., for misappropriation of trade secrets under the Defend Trade Secrets Act.  The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the Texas Uniform Trade Secrets Act, breach of contract, tortious interference, and fiduciary duty and duty of loyalty claims because they involve a common nucleus of operative fact.

11.     Venue and personal jurisdiction with respect to Luther are proper in this Court pursuant to 28 U.S.C. § 1391 pursuant to the Proprietary Information and Inventions Agreement between CesiumAstro and Luther, dated December 27, 2020, and as amended on February 11, 2021 (the "PIIA," attached hereto as Exhibit A).  The PIIA contains a mandatory forum selection clause designating the "state or federal courts in Travis County, Texas" as the exclusive venue for any action arising out of or in any way related to the PIIA.  Venue and personal jurisdiction with respect to Luther are also proper because a substantial portion of the events and omissions giving rise to this lawsuit occurred in this District and Division.  These events and omissions include Luther entering into the PIIA, Luther's employment with CesiumAstro, and Luther's actions to misappropriate CesiumAstro's trade secrets and breach the PIIA.

12.     Venue and personal jurisdiction with respect to AnySignal are proper because a substantial portion of the events and omissions giving rise to this lawsuit occurred in this District and Division as they relate to AnySignal.  These events and omissions include AnySignal recruiting and inducing Luther, a resident of this District and Division, to improperly disclose the

confidential and trade secret information of CesiumAstro, a company with its principal place of business in this District and Division, and to tortiously interfere with CesiumAstro's rights under the PIIA, a contract between Luther and CesiumAstro that contains a mandatory forum selection designating "state or federal courts in Travis County, Texas" as the exclusive venue for any action arising out of or in any way related to the PIIA. These acts and omissions further include AnySignal's misappropriation of CesiumAstro's trade secret and other confidential and proprietary information from this District and Division. There are additional examples of AnySignal's forum contacts, but CesiumAstro cannot include them in this public filings because Luther has (improperly) designated them as "attorney's eyes only" in pre-suit negotiations with CesiumAstro.

## IV.
## FACTUAL BACKGROUND

**A.      CesiumAstro and its Trade Secrets.**

13.      Headquartered in Austin, Texas, CesiumAstro is an industry leader in active phased array and software-defined communication payload systems for space, airborne, and ground platforms, including satellites, missiles, unmanned aircraft systems, vehicles, and more. CesiumAstro offers—for a wide range of dual use commercial and national security applications—a unique product suite of scalable products, from discrete modules to complete full-stack software-defined payloads that work right out-of-the-box, including all hardware, software, and firmware required to provide high-throughput connectivity. These products range from those designed for single-beam satellite downlink solutions to multi-beam and full-duplex communication payloads. Cesium's hardware and software solutions enable a range of commercial, governmental, and defense objectives.

14.     Among CesiumAstro's cutting-edge offerings is its Software Defined Radio ("SDR") products, including its state-of-the-art SDR-2104, the Reconfigurable Digital Processor, the SDR-1001, Commpack and Nightingale, which implement traditional analog fixed-features of a radio communications systems controllable by means of computer software.  CesiumAstro's SDRs are novel, modular, scalable systems—tested and qualified to NASA GEVS standards. These SDRs can work alongside other devices featuring waveform technology to comprise high-powered offering that can establish and maintain dynamic communications networks in space.

15.     CesiumAstro pours its resources into the research and development of these technologies to create industry-leading products.  For example, it has received and put to good use over $100 million in venture-backed funds and government-sponsored grants.  And with respect to its waveform technology, CesiumAstro has spent years developing it, engaging engineers of practically every field of electrical, mechanical, and software discipline, and even acquiring a London-based company specializing in the difficult-to-pioneer technology.  Few others are developing this specialized technology for aerospace applications.  And to CesiumAstro's knowledge, no other company has the capabilities to combine this waveform technology with SDRs to create an offering like its SDR product line.

16.     Given the specialized nature of its designs and products, CesiumAstro's business depends in part on this intellectual property, which CesiumAstro goes to great lengths to protect. CesiumAstro's trade secrets and confidential information span a wide variety of operations and business activity, such as business know-how relating to corporate strategies, pricing information, and the identities and contact information of strategic partners, investors, and loyal customers. These trade secrets and confidential information further include, for example, customer and investor lists, pricing and bid information, product-development processes and procedures,

patterns, compilations, methods, techniques, customer preferences, and other processes. These trade secrets and confidential information further include curated compilations showing the names and sometimes contact information of potential partners, vendors, customers, and investors. They also include the content and summaries of CesiumAstro's negotiations and bid information to develop its key strategic and customer relationships and grow its business. And they include CesiumAstro's best sales practices and strategies for maintaining and growing its customer, vendor, and investor relationships. CesiumAstro's trade secrets and confidential information also include technological information covering CesiumAstro's development of a suite of scalable products for active phased array communications and SDR technology. These further include, for example, schematics and diagrams of CesiumAstro's products and scalable offerings of active phased array communications technology—the SDR technology generally, waveform technology, CesiumAstro's CommPack, Nightingale, and its many other products—as well as the trial-and-error research and development that went into these products and offerings. All of these trade secrets and confidential information described in this paragraph (collectively, the "Trade Secrets") are related to products or services that CesiumAstro uses in, or intends to use in, interstate or foreign commerce. CesiumAstro uses its Trade Secrets to market, promote, and sell products— that themselves incorporate the Trade Secrets—to customers nationwide and beyond.

17. CesiumAstro's Trade Secrets derive considerable value from not being publicly known outside of CesiumAstro. They derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use. The secrecy of the Trade Secrets gives CesiumAstro a competitive advantage and contributes to CesiumAstro's technology standing out from that of its competitors. For example, based on its technological diagrams,

schematics, processes, and other technical information, CesiumAstro is able to build and deliver cutting-edge products that its competitors simply cannot match; the publicity of this technological information or its use by competitors would allow CesiumAstro's competitors to advance their own products and narrow the wide gap between CesiumAstro and the next best solutions available on the market.  Similarly, the secrecy of CesiumAstro's customer, vendor, investor, and other business information has independent economic value; if CesiumAstro's competitors had access to CesiumAstro's compilations memorializing its customers, vendors, and investors—including information like pricing, best practices, contacts, and behaviors attendant to each—those competitors could unfairly compete for customers and investors, harming CesiumAstro's market share and the goodwill of CesiumAstro's reputation as a leader in this space.

**B.    CesiumAstro's efforts to protect its Trade Secrets.**

18.    CesiumAstro takes reasonable steps to protect its Trade Secrets and other confidential information from disclosure.  These steps include policies and procedures regarding employees, third parties, electronic protections, and physical security.  One such step is to only disclose the Trade Secrets to employees on a need-to-know basis.  And when CesiumAstro does disclose the Trade Secrets, it first requires employees who stand to gain access to sign a confidentiality agreement, like the PIIA that Luther signed when his employment with CesiumAstro began.

19.    Among other things, these agreements generally require employees with access to the Trade Secrets and other confidential information:

- to not disclose or use confidential or Trade Secret information without CesiumAstro's prior consent;

- to use CesiumAstro's confidential or Trade Secret information only for the benefit of CesiumAstro;

- to return all company property, including confidential and Trade Secret information, immediately upon termination of employment; and

- to assign any inventions or intellectual property developed in the course of their employment to CesiumAstro.

20.    Further, CesiumAstro limits access to the Trade Secrets through actions and procedures designed to prevent any unauthorized use or disclosure.  For example, entry into CesiumAstro's facilities is controlled; access is allowed only to authorized individuals with a badge, and a "no tailgating" policy is posted at entrances.  Inside, Trade Secrets reduced to hardcopy reside in secured locations; again, access is allowed only to authorized individuals. CesiumAstro protects its IT systems with passwords and unique login credentials, and monitors them with security personnel and software; once again, access is limited to only authorized individuals.   CesiumAstro also maintains other network protections to prevent unauthorized external access, including firewalls, encryption, and cyber security software.

21.    CesiumAstro maintains employee policies that express the importance of confidentiality and prohibit unauthorized actions regarding confidential information, including an employee handbook.  CesiumAstro also trains its employees on the importance of maintaining confidentiality.

22.    When disclosing any Trade Secrets or other confidential information to third parties like customers, partners, or vendors—which CesiumAstro only does on a need-to-know basis—CesiumAstro requires executed non-disclosure agreements preventing any unauthorized use or disclosure.

**C.**      **Luther agrees to maintain CesiumAstro's Trade Secrets in confidence, return them to the Company upon his termination, and to not compete for a year after termination.**

23.      As a condition of his employment with CesiumAstro, Luther signed the PIIA in December 2020.  This PIIA limits access, use, and disclosure of confidential information to protect CesiumAstro's Trade Secrets and other confidential information.  It also contains a one-year non-compete clause.

24.      In particular, with respect to CesiumAstro's Trade Secrets and confidential information, Luther agreed that "[CesiumAstro] has invested significant time, money, and expertise in developing the Proprietary Information and developing the goodwill and relationships it enjoys with actual and potential customers, employees, vendors, and independent contractors." Ex. A § 2.1.  Luther agreed that "[a]s a result of [his] Service, . . . [he would] receive Proprietary Information and Third Party Information and be associated with the Company's goodwill."  *Id.*

25.      Luther agreed that he would hold this information "in the strictest confidence" and "not use, except for the benefit of the Company, any Proprietary Information and [would] not disclose, make available, discuss, transmit, use, lecture upon, or publish any Proprietary Information, except as" expressly authorized by CesiumAstro's Board or CEO.  *Id.* § 2.2.

26.      The PIIA also imposed more specific requirements on how Luther was to maintain (or not) CesiumAstro's Trade Secret and other confidential information.  Luther agreed he would not "store or backup, in whole or in part, any Proprietary Information or Third Party Information on or using any service or device not owned by the Company, unless expressly authorized to do so."  *Id.* § 2.6.

27.      Luther further agreed that during his employment, he would "not use [his] association with the goodwill of the Company for the benefit of any person or entity other than the Company."  *Id.*

10

28.     At the end of his employment—or at any time at CesiumAstro's request—Luther agreed to

> immediately deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) all drawings, records, data, notes, reports, proposals, lists, correspondence, blueprints, sketches, materials, equipment, memoranda, specifications, devices, formulas, and other documents (whether written, printed, or otherwise reproduced or recorded), together with all copies and derivations thereof, including copies or derivations stored in any electronic medium, and any other material containing, constituting, or disclosing any Company Inventions, Third Party Information, or Proprietary Information.   I will also immediately deliver all Company property, including but not limited to, laptops, pagers, cell phones, corporate credit cards, keys and/or access cards.

*Id*. § 7.  CesiumAstro's Employee Handbook contains a similar company policy applicable to the termination of employment:  "A team member must return all equipment, manuals, documentation, lab notebooks, or any other property of CesiumAstro prior to receiving his or her last paycheck." Before starting at CesiumAstro, Luther signed a form acknowledging and agreeing to be bound by the Employee Handbook.

29.     Also in the PIIA, Luther agreed to "irrevocably assign to and vest all title, interest, and right in the Company all my Ownership Rights in and to any and all Company Inventions," and he "acknowledge[d] that all Company Inventions shall be the sole property of the Company and that the Company shall be the sole owner of all Ownership Rights in connection therewith." Ex. A § 3.1.  The PIIA defines "Company Inventions" as

> "discoveries, developments, improvements, trade secrets, processes, formulas, data, lists, software programs, and all other works of authorship, mask works, ideas, concepts, know-how, designs, methodologies and techniques, whether or not any of the foregoing is or are patentable or registrable under copyright or any other intellectual property laws or industrial property laws in the United States or elsewhere" that "(i) relate to the business or proposed business of the Company and that are discovered, developed, created, conceived, reduced to practice, made, learned or written by me, either alone or jointly with others, during my Service;

(ii) utilize, incorporate or otherwise relate to Proprietary Information; or (iii) are discovered, developed, created, conceived, reduced to practice, made, or written by me using Company time, property or equipment."

*Id*. § 1.1 (defining "Company Inventions" and incorporating the definition of "Inventions");

*id*. § 1.3 (defining "Inventions").

30.     The PIIA also prohibited Luther from competing with CesiumAstro during his employment and for a period of one year thereafter.  Specifically, Luther acknowledged his understanding that "the Company's willingness to provide [him] with access to the Proprietary Information and Third Party Information and to associate [him] with the Company's goodwill is based in material part on [his] agreement to the [non-compete and non-solicitation provisions of the PIIA] and that any breach of [these provisions] will materially damage the Company."  *Id*. § 5.1.  Luther also "acknowledge[d] the nature of the Proprietary Information and Third Party Information to which [he] will be given access would make it difficult, if not impossible, for [him] to work for a competing company in a position where [his] duties are similar to those [he] perform[s] for the Company without disclosing or utilizing the Proprietary Information and Third Party Information."  *Id*.  Accordingly, Luther agreed that

during the course of my Service [at CesiumAstro], and for a period of twelve (12) months immediately following the end of my Service for any reason, I will not, either directly or indirectly, (i) act in or oversee, or agree to act in or oversee, any role that is similar in one or more ways to my role for the Company, whether as an advisor, agent, consultant, director, employee, officer, partner, proprietor or otherwise of, or (ii) participate in the organization, operation, management or control of, any person, corporation, firm, or other entity that competes with, or that is planning to compete with, the Company's business in the Territory [which is limited to only certain geographic areas in which "(I) the Company's products and services are then deployed, (II) the Company then has a customer or (III) the Company then has operations or otherwise targets sales and marketing activities."]

*Id*. § 5.4(a).  Luther further agreed that this one-year time period would be "be extended by one day for each day [he] fail[s] to comply with the restriction at issue."  *Id*. § 8.2.

31.    The PIIA's prohibitions on Luther's ability to compete extend to interference with customer relationships.  *Id*. § 5.2  For a year following the termination of his employment, Luther agreed that he would not

> (i) solicit any Customer for business involving Competitive Products or Services; (ii) communicate with any Customer, or communicate with another person regarding any Customer, for the purpose of causing or enabling the Customer to terminate, diminish, or alter in a way that is disadvantageous to the Company its business relationship or potential business relationship with the Company; (iii) provide any Customer with Competitive Products or Services; or (iv) assist any other person or entity in accomplishing any of the foregoing.

*Id*.

32.    As a remedy for any breach of the PIIA, Luther agreed that "any breach or threatened breach of any term of this Agreement will result in immediate and irreparable harm to the Company and will cause damage to the Company in amounts difficult to ascertain and that monetary damages alone will not provide an adequate remedy to the Company."  *Id*. § 8.1.  Luther acknowledged that breach of the PIIA would entitle CesiumAstro to emergency, preliminary, and permanent injunctive relief.  *Id*.

33.    CesiumAstro performed all of its contractual obligations under the PIIA, which is supported by adequate consideration.

**D.    Luther gains access to CesiumAstro's Trade Secrets.**

34.    After signing the PIIA, Luther joined CesiumAstro as Commercial Business Development Director.  By January 3, 2022, he was promoted to Vice President of Product. Subject to his compliance with his PIIA and CesiumAstro policies, Luther was granted access to confidential systems, information, and documents in connection with his employment duties with

CesiumAstro, including the Trade Secrets.  Luther was engaged in product development, business development, sales, and customer engagements, including technical requirements and corporate strategy.  He was a close advisor to the CEO.  Among these many responsibilities, he devoted particular attention to CesiumAstro's SDR technology.

35.     During Luther's employment with CesiumAstro, AnySignal was incorporated in May 2022 by John Malsbury (now its CEO) and Jeffrey Osborne (now its COO).  Malsbury and Osborne have had personal connections with Luther for years.  Luther and Malsbury worked together in product management at Ettus Research around 2012 to 2014.  And Luther and Osborne both acted as advisors to Qoherent, Inc., another company developing radio communications technologies.  When Luther joined CesiumAstro, he disclosed his advisor position at Qoherent, explaining that Qoherent was not competitive with CesiumAstro, and was in the business of AI and quantum computing for wireless communications.  Since then, however, and without Luther providing any updates to CesiumAstro about this change, Qoherent's business model has evolved to also become directly competitive to CesiumAstro's.  Specifically, Qoherent is involved in the creation of "intelligent radios" that purport to leverage AI software in radio systems.

36.     AnySignal is also a direct competitor to CesiumAstro.  As explained on its website, "AnySignal provides end-to-end solutions that cover communications, radar, navigation, and RF sensing for advanced aircraft, satellites, and national security."

37.     Luther oversaw CesiumAstro's marketing and sales, with a particular focus on CesiumAstro's commercial satellite business encompassing the SDR product line and waveform technology, among other things.  His responsibilities required a knowledge of and access to CesiumAstro's technologies, which he earned through the PIIA, including its schematics, design and manufacturing plans, software, and firmware.

38.     Luther's roles—and again, the PIIA—also earned him access to CesiumAstro's business and contractual information, including:  CesiumAstro's curated compilations of identities of customers, vendors, and investors; their pricing information, preferences, and historical behavior with the company; and CesiumAstro's bidding practices and specs for customers and vendors.

**E.     Luther resigns from CesiumAstro, refuses to return company property, and spoliates evidence of his wrongdoing.**

39.     Luther has improperly designated as "attorney's eyes only" certain documents that evidence AnySignal's and Luther's misappropriation of CesiumAstro's Trade Secrets.  Because of Luther's improper designations, CesiumAstro cannot detail these documents in this public pleading but will do so at the appropriate time.

40.     On August 17, 2023, Luther told Cesium's CEO that he intended to resign.  The two had a discussion the next day about Luther's time at Cesium.  Luther said that he was going to miss the relationship with Cesium's recently acquired London office—the same one that Cesium acquired to advance its waveform technology.  Luther also said he intended to go work for a small, "three-person" company, whose work was more aligned with his interests.  AnySignal fits that description.  At that time, AnySignal only had three employees listed on its website.  And AnySignal's work in SDRs is aligned with Luther's interests.  These same facts do not exist for the marketing and sales role that Luther would later tell CesiumAstro he accepted with a company called Saleae, Inc.  Saleae's website lists over a dozen employees (but not Luther) and explains that the company makes and sells logic analyzers for electrical circuits.

41.     On August 18, 2023—the same day of his discussion with CesiumAstro's CEO described above—Luther accessed an uncharacteristically large number of files (over 40) on his CesiumAstro desktop computer compared to his usual computer activity.  Among the filenames

were terms like "Competitive Analysis" and "CesiumAstro – Sales and Financial Model Overview.pptx."

42.    Early on the morning of August 21, 2023, Luther tendered his formal resignation by email.  Announcing his intention to compete with CesiumAstro and violate his non-compete obligations, Luther wrote:  "I plan to stay involved in the industry."  Luther also requested "a modification of the non-compete terms"; his attached resignation letter explained that this modification was intended to allow him to "continue work in [his] chosen field and pursue [his] entrepreneurial ambitions."  Luther went so far as to include a draft release of his non-compete obligations in the PIIA.  CesiumAstro declined this offer.

43.    Because Luther had access to CesiumAstro's confidential and Trade Secret material, CesiumAstro decided to exit him from the company the day he resigned.  This decision led to an exit meeting, at which Luther reiterated his requests to modify his non-compete obligations.  He told CesiumAstro's Chief of Staff and Vice President of Human Resources that he wanted to remain in the industry—specifically so he could develop his competing "ideas around SDRs."  Of course, these "ideas" belonged to CesiumAstro pursuant to Luther's assignment of all rights to inventions to the company under the PIIA.  Ex. A § 3.1.  CesiumAstro declined Luther's offer that would have allowed him to compete in exchange for nothing.

44.    CesiumAstro realized that afternoon that Luther's company-assigned laptop was not in his office.  Luther said he forgot it at home and would have to return home to get it, even though he acknowledged during his exit meeting that he knew there was a good chance he would be "walked out" that very day.  After several hours, Luther returned with it.  Upon information and belief, Luther manufactured the "mistake" of forgetting his device at home to buy additional

time to attempt to spoliate evidence of his wrongdoing.  On the day of his departure, he was prevented from wiping the laptop only because CesiumAstro was able to remotely lock the device.

45.     Luther also returned his company-issued iPad that day—which he spoliated by resetting it to factory settings without any notification to or authorization from CesiumAstro.  And Luther never mentioned the various USB drives in his possession that forensic evidence shows had been plugged into his CesiumAstro laptop and contained company files.  On information and belief, Luther deleted data on and claimed to misplace these devices to spoliate evidence of his wrongdoing, including Trade Secrets in his possession.

46.     Throughout his final day, Luther continued to access an inordinate and out-of-character volume of CesiumAstro's files on his CesiumAstro desktop.  He accessed over 100 files that day, almost all during the morning.  These included an executed request for quote for a major CesiumAstro customer (dated just a few weeks prior), numerous files from "Development/Proposals" subfolders on CesiumAstro's SharePoint storage, and many other instances of internal notes, pipeline, and meeting summary documents.

47.     On his final day, Luther executed an Employee Termination Certificate (the "Termination Certificate," attached hereto as Exhibit B).  In it, Luther agreed and warranted the following as true and correct:

- "The name of my new employe is Saleae and my job title or function is marketing & sales."

- "It is not my intent to become employed or otherwise associated with a company who provides services or products related to or competitive with those of the Company."

- "I understand I must notify the Company of any employment or other service for compensation or remuneration relationship into which I enter in the 12-month period following the end of my employment with Company"

- "I understand I have non-disclosure. non-competition. and non-solicitation obligations under my [PIIA] and I hereby reaffirm my intent to comply with same."

- "I understand I have an obligation under my Agreement to search diligently for any and all Proprietary Information and Third Party Information that may be in my possession or stored on any electronic device or medium of any kind to which I have access and affirm I have done so."

- "I understand I am prohibited under my Agreement from retaining any copy, compilation, or derivation or any Proprietary Information and affirm I have not done so, will not do so, and will immediately notify the Company's Chief Executive Officer if I later discover or otherwise come to have any Proprietary Information or Third Party Information in my possession."

Ex. B.  Many of these representations proved to be false.

**F.**     **AnySignal solicits and Luther discloses CesiumAstro's Trade Secrets.**

48.     Despite Luther's best efforts to cover his tracks, CesiumAstro has—even without discovery—uncovered evidence of his misappropriations of CesiumAstro Trade Secrets, along with his scheme with AnySignal to use that information in competition against CesiumAstro.

49.     For example, on February 26, 2022, Luther forwarded from his CesiumAstro company email address to his personal email address a CesiumAstro excel file titled "International Partnership Opportunities.xlsx," which contains a curated compilation of competing and potential partner space companies, as well as one of its "[i]nvestors."  This conduct violated the PIIA's prohibition on "stor[ing] or back[ing-]up, in whole or in part, any Proprietary Information or Third Party Information on or using any service or device not owned by the Company, unless expressly authorized to do so."  Ex. A § 2.6.

50.     In another violation, on March 19, 2022, Luther sent from his CesiumAstro company email address to his personal email address a CesiumAstro slide deck regarding

CesiumAstro's offerings and bearing a footer stating "Proprietary Information" and "Contains Cesium Trade Secrets."

51.     As another violation, on April 22, 2023, Luther forwarded from his CesiumAstro company email address to his personal email address an email containing the contact information for individuals at an important prospective CesiumAstro investor, whose niche investment role in this field is also not widely known ("Investor A").  CesiumAstro was introduced to Investor A only by personal introduction from one of CesiumAstro's lead investors ("Investor B").  As part of his employment with CesiumAstro, Luther attended numerous events with Investor A and Investor B.  For example, he attended an event co-sponsored by the two in April 2023.  Luther plotted to exclude CesiumAstro's CEO from attending that same event—assuring him it was going to be a "low-level get together" that did not warrant the CEO's attendance.  But just before the event, the head of Investor B inquired with CesiumAstro's CEO about attendance, as Investor B wanted to introduce him to noteworthy potential investors and customers.  Not only that, Investor B had intended for CesiumAstro to be a key feature at the event and for its CEO to be the panel speaker.  On information and belief, Luther withheld this information from CesiumAstro's CEO to disrupt these introductions and divert these opportunities and relationships to himself, for his own benefit and for the benefit of one or more of CesiumAstro's competitors, including AnySignal.

52.     In addition to the examples described above, throughout 2022 and 2023, Luther forwarded at least 12 other emails containing company information, including contact information for investors and customers, from his CesiumAstro email account to his personal email account.

53.     Luther's employment also exposed him to one of CesiumAstro's early investors— a niche, national-security focused investment firm in Washington, D.C., whose investment role in

this field is not widely known ("Investor C").  Luther maintained a close relationship with Investor C, including by seeking many one-on-one meetings with Investor C.  On or around October 2, 2023, Investor C informed CesiumAstro that it had received inbound interest on a potential investment in AnySignal.  At that time and now, AnySignal had just a handful of employees.  The likelihood of AnySignal having any meaningful connection to a well-shrouded, niche investor, is low.  Instead, on information and belief, AnySignal sought CesiumAstro's Trade Secrets regarding the identity and practices of CesiumAstro's investors, including regarding Investor C, and then Luther and AnySignal used them.

54.     For almost a year-and-a-half following its incorporation, AnySignal had operated in "stealth mode," signifying that it was a startup operating to avoid public attention while it came up with a business plan and developed products.

55.     AnySignal's emerged from stealth mode in October 2023, including by announcing in industry publications that it was, with the backing of only $5 million in funding, releasing radio products "with ground equipment for hardware-in-the-loop tests, modems that can be upgraded for different waveforms, licensing support, and software that enables the radio to interface with various flight systems."  AnySignal's utilization of SDRs alongside waveform technology is in direct competition with CesiumAstro—including its SDR products, use of waveform technology, and  other similar offerings.  And, as discussed, it took CesiumAstro tens of millions of dollars, seven years of research and development, the acquisition of a London company, and engineers from numerous disciplines to pioneer these technologies.  Luther's work at CesiumAstro, including his interactions with CesiumAstro's London office, exposed him to Trade Secrets dealing with waveform technology.  And during the bidding processes for CesiumAstro's SDRs, Luther received Trade Secrets relating to CesiumAstro's SDR technology, including diagrams and

schematics of CesiumAstro's products and data on CesiumAstro's pricing, costs, and profit margins on these types of projects.  On information and belief, there is little likelihood that, without access to CesiumAstro's Trade Secrets, AnySignal could achieve this complex SDR and waveform technology within 18 months of incorporation, with only its $5 million in investment and a few employees.  Instead, on information and belief, AnySignal conspired with Luther to misappropriate and did misappropriate certain of CesiumAstro's Trade Secrets, including diagrams and schematics relating to SDRs and waveform technology, which he accessed in his role with CesiumAstro.

56.     Understanding the risks of AnySignal's role in Luther's misappropriations—and AnySignal's own misappropriations—CesiumAstro sent AnySignal a letter on December 1, 2023.

57.     AnySignal never responded.  Instead, on information and belief, AnySignal proceeded with misusing CesiumAstro's Trade Secrets disclosed to it by Luther.  In February 2024, AnySignal won a bid for SDR work over CesiumAstro from a major customer with whom CesiumAstro had a pre-existing relationship ("Customer A").  While Luther was employed by the company, CesiumAstro tasked Luther with developing a proposed partnership plan with a company that Customer A later acquired.  Through his CesiumAstro work, Luther accessed CesiumAstro Trade Secrets specific to the company that Customer A eventually acquired, including information about CesiumAstro products (such as SDRs), pricing (such as prices, costs, and profit margins), and critical vendor relationships.  Indeed, Luther's role at CesiumAstro depended on these types of materials in preparing bids for customers and vendors for the types of SDR technology that Company A later purchased from AnySignal.  On information and belief, AnySignal sought and Luther disclosed these CesiumAstro Trade Secrets, which AnySignal used to unfairly compete against CesiumAstro and win Customer A's business.  This conduct violated

the provision of the PIIA prohibiting Luther from interfering with CesiumAstro's customer relationships.  Ex. A. § 5.2.

**G.**    **Luther continues to obfuscate his misconduct.**

58.    In the weeks and months since he left the company, CesiumAstro has tried to work with Luther to ensure that its Trade Secrets are protected and that Luther abides by his duties and contracts, but Luther continues to delay, obstruct, and spoliate information relevant to his misconduct.

59.    CesiumAstro, through counsel, sent Luther a letter on August 31, 2023. CesiumAstro reminded Luther of his post-employment obligations, including his non-compete obligations along with the PIIA's requirements to return any company property.    This straightforward request began a months-long—and still ongoing—chase to secure Luther's basic cooperation and compliance with the PIIA.

60.    Luther responded on September 5, 2023, that he had identified the following materials in his possession, which he described as "CesiumAstro property, proprietary information, third party information, etc.":  105 photos, 22 videos, 21 "iNotes," 83 received emails, and two sent emails.  This disclosure revealed the falsity of Luther's representations in the Termination Certificate that he had conducted a diligent search for company materials in his possession and had not copied them.  And based on what CesiumAstro has since learned and continues to learn, Luther's September 2023 representations about his retention of company property would prove to be incomplete and false in other ways.

61.    A forensic review revealed at least four USB devices, some of which Luther then claimed were his personal devices, had been plugged into his CesiumAstro laptop.  CesiumAstro first identified these devices to Luther by serial number and demanded their return pursuant to the PIIA in early October 2023.  Luther's counsel spent a month dodging inquiries about the devices

and their location.  When he finally did respond substantively, his response was alarming—only some of the devices were available, some had been lost, and Luther never explained what happened to them.

62.     Determined to protect its Trade Secrets and secure their safe return and remediation, CesiumAstro agreed to negotiate with Luther regarding a forensic protocol that would govern the return of all CesiumAstro information in his possession.  Luther said he would only discuss a forensic protocol if CesiumAstro provided unrelated concessions regarding Luther's ineffective attempt to exercise an option to purchase CesiumAstro stock.  And when the parties finally began discussing the forensic protocol, Luther continued to insist that he would not return any materials to CesiumAstro unless and until CesiumAstro processed his stock option exercise.  Luther also attempted to make his agreement to a forensic protocol contingent upon CesiumAstro's release of Luther from any liability associated with the forensic findings.  Cesium declined both proposals.

63.     Eventually, CesiumAstro and Luther broke the logjam.  After months of negotiations, the agreed forensic protocol provided, in short, that (1) Luther would turn over two USB flash drives, an external hard drive, and three personal email accounts, (2) Luther would have the opportunity to identify and withhold privileged materials, for which he must provide a privilege log, and (3) the remaining hits would be provided to CesiumAstro, through its counsel, on either a "confidential" or "attorney's eyes only basis," provided that the parties were to "meet and confer in good faith to determine whether the confidentiality designation of any 'Hits' should be modified from Attorney Eyes Only to Confidential."

64.     Luther failed to follow the agreed terms of the forensic protocol and instead hid information to which CesiumAstro is entitled.  For example, Luther failed to produce a privilege log, suggesting that he hid evidence of his wrongdoing through baseless assertions of privilege.

Luther also abused the attorney's eyes only designations—including on materials such as email blasts from trade publications and materials marked on their faces as CesiumAstro's.  This over-designation has prevented CesiumAstro's counsel from consulting with its client on technical information or detailing in this filing Luther's communications with third parties.  To solve this issue, CesiumAstro's counsel requested the de-designation of these attorney's eyes only materials, which do not appear to contain Luther's own sensitive material.  Luther's counsel's response flew in the face of the agreed requirement in the forensic protocol to meet and confer in good faith regarding the re-designation of these materials:  "I disagree, so no."

65.     Hamstrung by Luther's continued obstruction and facing competitive harm by AnySignal's misuse of its Trade Secrets, CesiumAstro had no choice but to file this suit to recover damages for its past harm and seek injunctive relief to prevent future harm.

## V.
## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Misappropriation Under and Violation of Defend Trade Secrets Act ("DTSA")**
**18 U.S.C. § 1836**
**Against Both Defendants**

66.     CesiumAstro incorporates and re-alleges each and every allegation above as if fully set forth herein.

67.     CesiumAstro is the owner of Trade Secrets, as defined above and incorporated herein.  These Trade Secrets relate to CesiumAstro's suite of scalable offerings of active phased array communications technology—the SDR technology generally, waveform technology, and its many other products—as well as the trial-and-error research and development that went into these products and offerings—and its business know-how relating to corporate strategies, including

pricing information, bid processes and practices, and the identities and contact information of strategic partners, investors, and loyal customers.

68.     CesiumAstro has taken reasonable and extensive measures to keep secret the Trade Secrets.  These are described and incorporated herein and include, for example, disclosing them on a need-to-know basis internally and externally (and requiring non-disclosure agreements before any external disclosures), password protecting computers, applying other network protections to prevent unauthorized external access, including firewalls, encryption, and cyber security software, requiring employees to abide by confidentiality rules and an employee code of conduct, and training employees on these rules.  Due to these security measures, the Trade Secrets are not available for others in the active phased array communications technology industry—or any other industry—to use through any legitimate means.

69.     CesiumAstro's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information in the ways described above and incorporated herein.

70.     At no time did CesiumAstro consent to Luther's taking, using, retaining, or disclosing the Trade Secrets for any purpose except for the benefit of CesiumAstro.  At no time did CesiumAstro consent to AnySignal's taking, using, retaining, or disclosing the Trade Secrets for any purpose at all.

71.     In violation of CesiumAstro's rights, Luther and AnySignal misappropriated the Trade Secrets within the meaning of the DTSA, 18 U.S.C. § 1836, in the improper and unlawful manners as alleged herein, including by acquiring, retaining, and using CesiumAstro's trade secret information.

72.     On information and belief, Luther misappropriated the Trade Secrets in the ways described above and incorporated here, including by improperly retaining CesiumAstro company files containing Trade Secrets, saving these files to removable memory and other servers and devices, removing these files from CesiumAstro's possession, refusing to return them, and retaining them after termination of his CesiumAstro employment, despite knowing that the Trade Secrets were acquired under circumstances giving rise to a duty for him to maintain the secrecy of the Trade Secrets and to refrain from using them either after his employment with CesiumAstro ended or for any purpose other than for the benefit of CesiumAstro.

73.     On information and belief, AnySignal misappropriated the Trade Secrets in the ways described above and incorporated here, including by receiving the CesiumAstro materials and information wrongfully disclosed to it by Luther, retaining those materials, and using them in direct competition with CesiumAstro, despite knowing that Luther had no authorization from CesiumAstro to possess or disclose the Trade Secrets, including after his employment with CesiumAstro ended.

74.     Luther's and AnySignal's ongoing misappropriation of the Trade Secrets is intentional, knowing, willful, malicious, fraudulent, and oppressive.  They know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

75.     As the direct and proximate result of Luther's and AnySignal's conduct, CesiumAstro has suffered severe harm and significant damages within the meaning of 18 U.S.C. § 1836(b)(3)(B)(i)(I), in an amount to be proven at trial.  In addition, Luther and AnySignal have been unjustly enriched as a result of his misappropriation of the Trade Secrets within the meaning of 18 U.S.C. § 1836(b)(3)(B)(i)(II), in an amount to be proven at trial.

76.     Because CesiumAstro's remedy at law is inadequate, CesiumAstro seeks, in addition to damages, permanent injunctive relief to recover and protect the Trade Secrets. CesiumAstro's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## SECOND CAUSE OF ACTION

**Misappropriation Under and Violation of the Texas Uniform Trade Secrets Act**
**Tex. Civ. Prac. & Rem. Code § 134A**
**Against Both Defendants**

77.     CesiumAstro incorporates and re-alleges each and every allegation above as if fully set forth herein.

78.     CesiumAstro is the owner of Trade Secrets, as defined above and incorporated herein.  These Trade Secrets relate to CesiumAstro's suite of scalable offerings of active phased array communications technology—the SDR technology generally, waveform technology, and its many other products—as well as the trial-and-error research and development that went into these products and offerings—and its business know-how relating to corporate strategies, including pricing information, bid processes and practices, and the identities and contact information of strategic partners, investors, and loyal customers.  These Trade Secrets comprise business, scientific, technical, economic, or engineering information that constitute "trade secrets" under Tex. Civ. Prac. & Rem. Code § 134A.002(6).

79.     CesiumAstro has taken reasonable steps to maintain the secrecy of its Trade Secrets.  These are described and incorporated herein and include, for example, disclosing them on a need-to-know basis internally and externally (and requiring non-disclosure agreements before any external disclosures), password protecting computers, applying other network protections to prevent unauthorized external access, including firewalls, encryption, and cyber security software, requiring employees to abide by confidentiality rules and an employee code of conduct, and

training employees on these rules.  Due to these security measures, the Trade Secrets are not available for others in the active phased array communications technology industry—or any other industry—to use through any legitimate means.

80.     These confidential and proprietary Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, others who can obtain economic value from their disclosure or use, and have conferred a competitive advantage on CesiumAstro in the relevant market in the ways described above and incorporated herein.

81.     Other than through Luther's improper disclosure and AnySignal's improper use, the Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

82.     On information and belief, Luther misappropriated the Trade Secrets in the ways described above and incorporated here, including by improperly retaining CesiumAstro company files containing Trade Secrets, saving these files to removable memory and other servers and devices, removing these files from CesiumAstro's possession, refusing to return them, and retaining them after termination of his CesiumAstro employment, despite knowing that the Trade Secrets were acquired under circumstances giving rise to a duty for him to maintain the secrecy of the Trade Secrets and to refrain from using them either after his employment with CesiumAstro ended or for any purpose other than for the benefit of CesiumAstro.

83.     On information and belief, AnySignal misappropriated the Trade Secrets  in the ways described above and incorporated here, including by receiving the CesiumAstro materials and information wrongfully disclosed to it by Luther, retaining those materials, and using them in direct competition with CesiumAstro, despite knowing that Luther had no authorization from

CesiumAstro to possess or disclose the Trade Secrets, including after his employment with CesiumAstro ended.

84.     Luther's and AnySignal's actual and threatened use and disclosure of the Trade Secrets constitute misappropriation because at the time of such use and disclosure, Luther and AnySignal knew or had reason to know that their knowledge of the Trade Secrets was derived through persons, including Luther himself, who owed a duty to CesiumAstro to maintain the secrecy of the Trade Secrets.

85.     Luther's and AnySignal's ongoing misappropriation of the Trade Secrets is intentional, knowing, willful, malicious, fraudulent, and oppressive.   They know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

86.     By reason of the above-alleged acts and conduct of Luther and AnySignal, CesiumAstro has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and CesiumAstro will be without an adequate remedy at law, and, therefore, is entitled to injunctive relief.  CesiumAstro is informed and believes that, if Luther and AnySignal are not enjoined, they will continue to disclose and use CesiumAstro's confidential, proprietary, and trade secret information for their own benefit and to CesiumAstro's detriment.

87.     CesiumAstro is also entitled to recover compensatory and punitive damages from Luther and AnySignal, including but not limited to the losses resulting from their wrongful conduct and any unjust enrichment caused by their misappropriation.  The amount of such relief cannot be determined precisely at this time.

### THIRD CAUSE OF ACTION

**Breach of Contract (PIIA)**
**Against Luther**

88.     CesiumAstro incorporates and re-alleges each and every allegation above as if fully set forth herein.

89.     Luther entered into a valid and enforceable contract with CesiumAstro—the PIIA—in exchange for continued employment with CesiumAstro.

90.     At no point was Luther's performance under the PIIA excused.    Luther acknowledged in the PIIA that "[t]he provisions of this Agreement shall survive the termination of my Service for any reason." Ex. A § 11.6.   In addition, he signed the Termination Certification on August 21, 2023 acknowledging his understanding of and intent to comply with the non-disclosure, non-competition, and non-solicitation obligations of the PIIA.  Ex. B.

91.     Luther breached the PIIA by, among other things, using CesiumAstro's Trade Secrets and Proprietary Information (as that term is defined in the PIIA) in a manner not for the benefit of CesiumAstro, and by disclosing these materials to AnySignal without authorization.  *Id*. § 2.2.

92.     Luther further breached the PIIA by storing Trade Secrets and Proprietary Information (as that term is defined in the PIIA) on services and devices not owned by CesiumAstro.  *Id*. § 2.6.

93.     Luther further breached the PIIA by failing to return these Trade Secrets and Proprietary Information (as that term is defined in the PIIA), along with other CesiumAstro information and devices.   *Id*. § 7.  With respect to certain devices, the condition in which he returned them—having been "wiped" of certain data and company files—further violates the provision of the PIIA requiring prompt return of company property.   *Id*.

94.     Luther further breached the PIIA by improperly competing with CesiumAstro by directly or indirectly acting in or overseeing a role, including with AnySignal and possibly others, that is similar to his role at CesiumAstro and/or by participating in the organization, operation, management, or control of AnySignal and possibly others that compete with, or that are planning to compete with, CesiumAstro's business as conducted during the court of his engagement with CesiumAstro in the geographic areas restricted by the PIIA. *Id*. § 5.4(a).

95.     Luther further breached the PIIA by improperly competing with CesiumAstro by interfering with customer relationships, including on information and belief by participating with AnySignal in the process of bidding for the business of Customer A. *Id*. § 5.2.

96.     CesiumAstro has performed all of its obligations under the PIIA.

97.     As a direct and proximate result of Luther's breach of the PIIA, CesiumAstro has been directly harmed in an amount to be proven at trial.

98.     Luther agreed that his breach of these provisions of the PIIA (a) would cause immediate and irreparable harm to CesiumAstro, (b) would cause damage to CesiumAstro in amounts difficult to ascertain, and (c) would not be adequately remedied by monetary damages alone.  Ex. A § 8.1.  By the terms of the PIIA, CesiumAstro is entitled to injunctive relief compelling Luther to comply with all provisions of the PIIA. *Id*.

99.     For Luther's breach the non-compete provisions of the PIIA, CesiumAstro is entitled to a declaration that the original one-year term of that provision shall be extended by one day for each day Luther failed to comply with the non-compete restriction at issue. *Id*. § 8.2.

100.    Further, for Luther's breach of the non-compete provisions of the PIIA, CesiumAstro is entitled to all attorney's fees incurred in seeking relief for that breach. *Id*.

## FOURTH CAUSE OF ACTION

### Breach of Fiduciary Duty and Duty of Loyalty
### Against Luther

101.    CesiumAstro incorporates and re-alleges each and every allegation above as if fully set forth herein.

102.    During his employment with CesiumAstro, Luther occupied a position of special confidence and trust.

103.    As a result, CesiumAstro gave Luther access to CesiumAstro's confidential and proprietary information.  With respect to this information and through his special position of confidence and trust with CesiumAstro, Luther owed a common law fiduciary duty and a duty of loyalty to CesiumAstro, including to avoid actions that would be injurious to CesiumAstro, self-dealing, and actions that would usurp corporate opportunities for personal gain.

104.    Luther violated these duties by unlawfully taking, retaining, and disclosing CesiumAstro's confidential and proprietary information and Trade Secrets and by usurping CesiumAstro's opportunities for the benefit of himself and others.

105.    As a direct and proximate result of Luther's breach of the PIIA, CesiumAstro has been directly harmed in an amount to be proven at trial.

106.    Because Luther's conduct was willful and malicious, CesiumAstro seeks punitive and exemplary damages.

## FIFTH CAUSE OF ACTION

### Tortious Interference with Contract (PIIA)
### Against AnySignal

107.    CesiumAstro incorporates and re-alleges each and every allegation above as if fully set forth herein.

108.    Luther entered into a valid and enforceable contract with CesiumAstro—the PIIA—in exchange for continued employment with CesiumAstro.  AnySignal is not a party to this contract.

109.    On information and belief, AnySignal was aware of Luther's obligations in the PIIA as early as August 2023.  On December 1, 2023, CesiumAstro sent AnySignal a letter, putting AnySignal on notice of Luther's ongoing obligations under the PIIA.  At least by this point and possibly earlier, AnySignal knew of Luther's obligations under the PIIA.

110.    Luther has improperly designated as "attorney's eyes only" certain documents that will reveal evidence of AnySignal's knowledge of these obligations.  Because of Luther's improper designations, CesiumAstro cannot detail these documents in this pleading but will do so at the appropriate time.

111.    AnySignal's discussions with Luther regarding employment and receipt, retention, and use of CesiumAstro's confidential and Trade Secret information wrongfully obtained from Luther have interfered with CesiumAstro's existing contractual relationship between Luther in the PIIA.  As a result of AnySignal's actions to wrongfully induce Luther to breach the PIIA, AnySignal deprived CesiumAstro of the benefit of its bargain in the PIIA, including in the provisions governing the treatment and return of CesiumAstro's confidential and Trade Secret information and the non-compete provisions.

112.    AnySignal committed the acts described above with actual malice and with the conscious desire to interfere with this relationship, or AnySignal was at least substantially certain that such interference would result from its conduct.  By the time of CesiumAstro's December 1, 2023 letter to AnySignal and possibly earlier, AnySignal was on notice of the PIIA and Luther's obligations under it.  Nevertheless, leading up to at least the February 2024 bid process for

Customer A's SDR business, AnySignal interfered with CesiumAstro's contractual relationship with Luther in the PIIA, including specifically with the provisions governing the treatment and return of CesiumAstro's confidential and Trade Secret information.  AnySignal was aware of the PIIA and acted with knowledge that its conduct would directly interfere with Luther's obligations under it.

113.    CesiumAstro has suffered actual damages as a result of AnySignal's interference.

## VI.
## DEMAND FOR JURY TRIAL

114.    CesiumAstro demands a trial by jury on all issues so triable.

## VII.
## PRAYER FOR RELIEF

CesiumAstro prays for a judgment against Luther and AnySignal, and each of them, as follows:

a.      A judgement in favor of CesiumAstro and against Luther and AnySignal;

b.      An award of damages caused by Luther's and AnySignal's conduct, including compensatory, unjust enrichment, punitive, and exemplary damages, as well as applicable interest;

c.      An injunction enjoining Luther and AnySignal, as well as their employers, agents, employees, and all persons acting in concert with them, from using, copying, publishing, disclosing, transferring, or selling CesiumAstro's Trade Secrets or other confidential or proprietary information that may be determined not to be Trade Secret information, or any product that is based on or incorporates part or all of CesiumAstro's Trade Secrets or other confidential and proprietary information, and from obtaining any commercial advantage or unjust enrichment from their misappropriation of CesiumAstro's Trade Secrets or other confidential or proprietary information;

d.      An injunction requiring Luther to comply with all terms of the PIIA, including by (i) holding CesiumAstro's Trade Secrets in the strictest confidence and not using them for any purpose; (ii) not using his association with the goodwill of the CesiumAstro; (iii) delivering to CesiumAstro all of its property in any form; (iv) refraining from competing with CesiumAstro for a period of one year following the end of his employment with CesiumAstro, plus an additional amount of time corresponding to the amount of time that Luther competed with CesiumAstro and that it took CesiumAstro to obtain a favorable judgment;

e.      A Declaration that neither Luther nor AnySignal have any rights or privileges to use CesiumAstro's trade secrets;

f.      A declaration stating that the original one-year term of the non-compete provision of the PIIA, Ex. A § 5.4, shall be extended by one day for each day Luther failed to comply with it;

g.      An order requiring Luther and AnySignal, as well as their employers, agents, employees, and all persons acting in concert with them, to return to CesiumAstro any and all of its Trade Secrets or other confidential or proprietary information that may be determined not to be Trade Secret information, including but not limited to any and all materials created incorporating or referencing CesiumAstro's Trade Secrets or other confidential information;

h.      The imposition of a constructive trust for the benefit of CesiumAstro upon (i) all assets misappropriated or used by Luther in violation of his contractual obligations to CesiumAstro, and all CesiumAstro trade secrets misappropriated by Luther and/or AnySignal; and (ii) all gains, including, but not limited to, any profits of, equity interests in, and/or increases in the value of equity interests in, Spark, derived from the breach of any agreements with CesiumAstro,

or from any misappropriation of CesiumAstro's Trade Secrets or other confidential or proprietary information by Luther and/or AnySignal;

     i.     Reasonable attorney's fees;

     j.     All costs of suit herein incurred; and

     k.     Such other relief as the Court may deem proper.

Dated:  March 24, 2024

Respectfully submitted,

O'MELVENY & MYERS LLP

*/s/ Patrick V. Plassio*
David S. Almeling (*pro hac vice* application forthcoming)
dalmeling@omm.com
Two Embarcadero Center
28th Floor
San Francisco, California 94111
Telephone:  +1 415 984 8700
Facsimile:  +1 415 984 8701

Kristin C. Cope (*pro hac vice* application forthcoming)
kcope@omm.com
Patrick V. Plassio
Texas Bar No. 24102362
pplassio@omm.com
2801 North Harwood Street, Suite 1600
Dallas, Texas  75201
Telephone:  +1 972 360 1900
Facsimile:  +1 972 360 1901